## APPEAL OF SHARPSVILLE BOILER WORKS CO.

Docket No. 1873.   Submitted August 8, 1925.   Decided February 3, 1926.

1. Upon the evidence, *held*, the taxpayer did not file a false or fraudulent return with intent to evade tax. Fraud penalty disallowed.

2. Amount authorized in 1917 as retroactive compensation for 1916 to officer-stockholders disallowed as ordinary and necessary expenses of 1917. Reasonable amounts as salaries for 1917 and 1918 determined.

3. Amount of deduction for depreciation and obsolescence determined.

*Hugh Satterlee, Esq.*, for the taxpayer.
*E. G. Smith, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, GREEN, and LOVE.

This is an appeal from the determination of a deficiency of $77,-325.38 in income and profits taxes for the years 1917, 1918, and 1920, and fraud penalty in connection with the taxes for 1917.

The errors assigned are:

(1) The inclusion in net income for 1917 of $49,100, deducted as accrued officers' salaries.

(2) The wrongful determination of a fraud penalty of $37,073.38 for 1917.

(3) The inclusion in net income in 1918 of $4,333.32, deducted as officers' salaries.

(4) The inclusion in net income for 1918 of $4,275.89, deducted by the taxpayer for exhaustion, depreciation, and obsolescence.

(5) The inclusion in net income for 1920 of $9,651.05, deducted by the taxpayer for exhaustion, depreciation, and obsolescence.

The Commissioner in his answer alleges that the sum of $49,100, which was disallowed as a deduction for officers' salaries in 1917, was in fact a reserve for the contemplated distribution of profits of the business to its officer-stockholders. The charge of fraud rests upon the contention that this sum was charged to expenses and was so reported by the taxpayer, falsely and with intent to evade the tax.

The Commissioner further alleges that the amount of the deficiency asserted in the notice mailed to the taxpayer, viz, $77,325.38, should be increased by the amount of tax which will result from adding to net income for 1918 additional sums which he claims should be disallowed as deductions from income. These claims are: (1) that the amount disallowed as officers' salaries in this year should be $18,530.64, instead of $4,333.32, as heretofore asserted, the increase being $14,197.32; and (2) that the amount of depreciation disallowed should be $11,871.89, instead of $4,275.89, the increase being $7,596. The Commissioner abandoned the last-mentioned claim at the hearing.

#### FINDINGS OF FACT.

The taxpayer is a Pennsylvania corporation, engaged in the business of manufacturing steel-plate work at Sharpsville. It was incorporated in 1907 with the name " Sharpsville Boiler Works." For some time prior to December, 1915, the company had not been prospering. In that month and year the plant was leased to Hugh J. Garvey and John L. Considine for a period of six months from January 1, 1916, and they, at the same time, obtained an option to purchase for $4,000 all of the outstanding capital stock, amounting to $11,000 par value. Garvey and Considine took into association with themselves Francis W. King, who had been connected with the taxpayer as a stockholder and officer since its incorporation.

They engaged James P. Keene, who had been employed by the taxpayer as manager since October, 1915, and Charles D. Fagan, to run the plant. It was operated by Garvey, Considine, and King in partnership until June, 1916, when they exercised the option to purchase the outstanding stock. On June 28, 1916, the name was changed to "Sharpsville Boiler Works Company," and the authorized capital stock was increased from $15,000 to $50,000 par value. The three purchasers then paid in to the company $4,000 in cash, and there was issued or transferred to each of them $5,000 par value of stock.

On February 10, 1917, the following officers were elected:

Hugh J. Garvey, president; John L. Considine, vice president; Francis W. King, treasurer; Charles D. Fagan, secretary; and James P. Keene, general manager.

These men continued in the respective offices mentioned during 1917 and 1918, with the exception that Considine resigned as vice president on July 1, 1918.

On June 29, 1916, Garvey, Considine, King, Keene, Fagan, and W. C. McGaffic were elected directors. McGaffic served as a director until December 8, 1916, when he resigned. The others continued as directors and constituted the board during 1917 and 1918, with the exception that Considine resigned on August 1, 1918, and R. F. Sawyer was elected a director in his place.

Keene and Fagan were given the right to, and each did, purchase $5,000 par value of stock for the sum of $2,666.67, this sum being the cost to each of the other three men of the same amount of stock. In March, 1916, W. C. McGaffic was employed and given a similar right to purchase stock. McGaffic left the employ of the taxpayer on December 8, 1916. A settlement was made with him at that time under which he was paid $2,514, and he released all right to or interest in stock of the company under the agreement mentioned above.

On May 23, 1917, the board of directors, at a special meeting, adopted a resolution providing for the transfer of the property, assets, and contracts of the copartnership consisting of Garvey, Considine, and King, which operated the property between January 1 and July 1, 1916, and an assignment accordingly was executed on May 23, 1917.

The following were introduced as minutes of the corporation:

Annual meeting, February 10, 1917:

As verbally agreed between the Directors last month, it was resolved that James P. Keene, General Manager and Charles D. Fagan, Secretary, be allowed a drawing account of $200.00 per month each for the first four months of this year.

It was further agreed that all of the officers receive same compensation for their services as heretofore, but in order to allow the Company the advan-

tage of having all possible working capital, that no other Officers take out any cash at present, their salaries however to be credited on the books to them and payable on demand, as well as the balance of salary due Messrs. Keene and Fagan.

## Special meeting, April 24, 1917:

The Secretary stated further, that Mr. Keene and he were of the opinion that their drawing account should be increased, as they had been drawing only a nominal amount to date, in fact much less than they felt they were entitled to for the services rendered, and as the business now appeared in condition to pay them a salary in cash, they would like to have an expression from the Directors.

The matter was discussed at length. Messrs. Garvey, King and Considine, who are also Officers of the Company expressed the opinion that they also, in view of the business being in better position to take care of its obligations, felt that they too should be entitled to a drawing account as they had received no salary in cash from the Company since its reorganization.

The following drawing accounts were decided upon for the remainder of the year, subject to change by the Directors at any time the business appeared to be in need of additional working capital or when it was the consensus of opinion that it would be for the good of the business for the drawing accounts to be reduced.

James P. Keene and Charles D. Fagan:

For May, June and July $250.00 per month, August $400.00, balance of year $650.00 per month, each.

Hugh J. Garvey, J. L. Considine and F. W. King:

For June and July $100.00 per month, August $250.00, balance of year $500.00 per month, each.

## Meeting, May 24, 1917:

As stated in previous minutes James P. Keene and Charles D. Fagan were given a certain drawing account and balance of April 30th, 1917 shows that account of James P. Keene is overdrawn $344.16 and account of Charles D. Fagan overdrawn $386.55. The Directors of the Company hereby authorize the Treasurer to pay to the above named parties, James P. Keene and Charles D. Fagan the sum of $344.16 each as a bonus, balancing Keene's account to April 30th, 1917 and leaving a balance of $42.39 in Charles D. Fagan's account. Charles D. Fagan to reimburse the Company with this amount.

## Special meeting, August 5 [year not stated]:

On motion it was unanimously resolved that Hugh J. Garvey, President, receive a salary of Five Hundred Dollars ($500.00) per month, John L. Considine, Vice President, receive a salary of Five Hundred Dollars ($500.00) per month; Francis W. King, Treasurer, a salary of Five Hundred Dollars ($500.00) per month; Charles D. Fagan, Secretary, a salary of Six Hundred Fifty Dollars ($650.00) per month and James P. Keene, General Manager, a salary of Six Hundred Fifty Dollars ($650.00) per month.

It was further resolved that this action be retroactive and that said salary date back to January 1st, 1916.

It was further resolved that only the General Manager, Mr. Keene and the Secretary, Mr. Fagan, draw any salaries in cash for the present and that whatever amount they draw be nominal only, and that these amounts be fixed from time to time by the Board of Directors. In every instance salaries

not paid or part of salaries not paid to be entered on the books of the Corporation as a debit against the Company. These entries to be made from time to time as the Directors may elect. Back salaries not to draw any interest from the Company.

It was further agreed that drawing account of $125.00 per month drawn by Messrs. Keene and Fagan from January 1st, 1916 to be in effect until October 1, 1916 and that they be permitted to draw $150.00 per month for balance of the year, subject to change at pleasure of the Directors.

Annual meeting, February 11, 1918:

The following salaries were agreed upon for the year 1918, it being understood, of course, that the Directors reserve the right to change same at their pleasure should conditions necessitate such action:

Hugh J. Garvey, $500.00 a month.

John L. Considine, $500.00 a month.

Francis W. King, $500.00 a month.

James P. Keene, January to July inclusive $650.00 a month, balance of year $800.00 a month.

Charles D. Fagan, January to July inclusive $650.00 a month, balance of year $800.00 a month.

After the reorganization, the minutes of directors' and stockholders' meetings were kept in typewritten form in a loose-leaf book, until the end of 1916. Objection was made by Keene to having the stenographer know the content of the minutes. Fagan thereupon acquired a bound book and commenced recopying into it in handwriting the minutes that had already been typewritten. Thereafter, Fagan kept memoranda of meetings and would copy them into the bound book as he found time. In 1922 the taxpayer had negotiations with a banking house relative to a bond issue, and Fagan was advised by the bankers to put the minutes in good shape because an audit was to be made. He thereupon obtained a loose-leaf book and had all of the minutes recopied therein, dictating those which he had still in memorandum form, and this book is the present minute book of the company. The recopied minutes were checked by Sisk, then secretary, and Fagan, and were signed by Garvey and Fagan. The two other books were lost.

The following table shows the amounts of salaries for 1916 and 1917 specified in the resolutions set forth above and the years and amounts in which they were paid:

|  | Specified in resolutions for— | | Paid in— | | |
|---|---|---|---|---|---|
|  | 1916 | 1917 | 1916 | 1917 | 1918 |
| Garvey | $6,000 | $6,000.00 |  | $1,950.00 | $10,050 |
| Considine | 6,000 | 6,000.00 |  | 1,950.00 | 10,050 |
| King | 6,000 | 6,000.00 |  | 1,950.00 | 10,050 |
| Keene | 7,800 | 8,144.16 | $1,575 | 4,894.16 | 9,475 |
| Fagan | 7,800 | 8,144.16 | 1,575 | 4,894.16 | 9,475 |
|  | 33,600 | 34,288.32 | 3,150 | 15,638.32 | 49,100 |

The taxpayer's books were kept and its tax returns were made on the accrual basis. The salaries not paid in 1916 were not entered on the books in that year.

In April, 1917, a public accountant made an examination and report on the financial position of the taxpayer. He set up the capital account; up to that time no capital entries had been made. There were then no charges on the books, and no reserves had been created, for unpaid officers' salaries. On or about December 31, 1917, and before the closing of the books for 1917, the following entries were made in the journal:

```
General Expense (a/c Operating Expense)_____ $47, 600. 00
     a/c Payable_____ $47, 600. 00
          For salaries due officers. For detailed explana-
     tion see adjustment sheet of Dec. 31, 1917, in posses-
     sion of Auditor.
General Expense_____ 1, 500. 00
     a/c Payable_____ 1, 500. 00
          Reserve for salaries due King, Considine and Garvey for Dec.
     a/c and not paid until January, 1918.
```

On September 26, 1918, the above item of $47,600 was debited to accounts payable, and the accounts of the several officers were credited as follows:

```
     Payment of stock H. J. Garvey_____$9, 550. 00
     Payment of stock F. W. King_____ 9, 500. 00
     Personal account J. L. Considine_____ 9, 500. 00
     Payment of stock Charles D. Fagan_____ 9, 475. 00
     Payment of stock James P. Keene_____ 9, 475. 00
```

This entry was made on the advice of a public accountant then examining the books.

The officers in their personal-tax returns for 1917 reported the amounts received as salaries. The accountant told them, when he was there in September, 1918, that they should have reported the total amount credited to them, and he recommended filing amended returns. Later, Fagan consulted a man in the office of the collector of internal revenue at Pittsburgh, who expressed the same view. In June, 1919, he filed an amended return, reporting a salary of $14,025; the original return showed $4,550. Fagan's original return was made on a cash basis; he did not keep any books. Each of the officers, except Keene, filed an amended return, reporting the amount of salary credited to him.

In the summer of 1918, an agreement was made between Garvey and Fagan for the purchase of the interest of the latter for $20,000. It provided for the sale by Fagan of 50 shares of stock and a "right to back salary due him by the company" amounting to $9,475. Garvey paid Fagan $10,000 on account of the purchase price. The agreement was later rescinded and the $10,000 was returned.

In December, 1918, Keene, for a consideration of $20,000, agreed to sell his interest to Garvey, who was acting for himself, King, Sawyer, and Fagan. Keene executed a bill of sale and release for 100 shares of stock and a claim " for back salary due " amounting to $4,475.

We find that the return for 1917 filed by the taxpayer was not false or fraudulent with intent to evade taxes.

Keene was general manager and had charge of production and erection. He also assisted on estimates. He was in the shop during the daytime and spent evenings in the office. Fagan assisted Keene in the shop, helped purchase materials, and worked on estimates. As secretary, Fagan kept minutes of the meetings. He also had charge of the accounting books; the first entries were made by him, and thereafter he directed the bookkeeper. He handled such of the correspondence as was not taken care of by Garvey, Considine, or King. Keene and Fagan were the only operating men, aside from the ordinary labor. During 1916, 1917, and 1918 it was their custom to go to work about 6 or 7 in the morning, to work all day, and to come back in the evening; they also worked nearly every Sunday.

Garvey and King were regularly employed by another concern in Sharpsville, which was engaged in making ingot molds. Considine was vice president of a steel company at Sharon, Pa., and was regularly engaged there. All three spent many evenings and Sundays at the plant during 1916, 1917, and 1918. It was their custom to have meetings in the evenings to go over the affairs of the taxpayer. Garvey or King, or both of them, were at the plant at some time during the day, and Keene and Fagan frequently would go to their offices for advice. Considine was not there as much as the other two, but he was consulted over the telephone. Garvey, King, and Considine, in consultation with Keene and Fagan, decided on the methods of conducting the business and how to employ the capital; they assisted in getting orders, and through their connections obtained steel that was essential to the operation of the business.

Garvey enabled the taxpayer to get steel plate on credit. He was able to obtain freight cars when there was a shortage. He usually came to the plant at noon and in the evenings after he had finished at his other place of employment. Garvey or King signed all the checks.

King had lived in Sharpsville 25 years and knew conditions there. He assisted in starting operations after the plant was leased; established plant records; secured new employees; found living quarters for them; obtained concessions on city property; assisted in purchasing additional property; secured water and sewer con-

nections; and helped to get railroad crossings through. He endorsed notes; arranged with banks for credit; arranged terms with customers; got credit for materials, and secured extensions of credit.

Considine rendered valuable services in obtaining steel and securing credit. Owing to the war it was difficult to get steel during this period and often it could not have been obtained without Considine's assistance. Some of it was bought through the purchasing department of his company, and the taxpayer was thereby given the benefit of a low contract price. He also obtained inquiries from prospective customers. He guided the others on costs and selling prices, and he had drawings and designs made. Through his assistance four or five months' credit was obtained.

The net income returned by the taxpayer for 1917 was $20,036.81; for 1918, $16,662.51.

The following tabulation shows the amounts of salaries for the years 1917 and 1918, either paid or accrued in those years, respectively, the amounts allowed by the Commissioner, and, in the case of 1918, the amounts which the Commissioner in his answer alleges are proper:

|  | 1917. | | 1918. | | |
|---|---|---|---|---|---|
|  | Taxpayer. | Commissioner. | Taxpayer. | Commissioner. | Answer. |
| Garvey | $6,000.00 | $2,450.00 | $6,000.00 | $2,400.00 | $2,400.00 |
| Considine | 6,000.00 | 2,450.00 | 3,000.00 | 1,200.00 | 1,200.00 |
| King | 6,000.00 | 2,450.00 | 6,000.00 | 2,400.00 | 2,400.00 |
| Keene | 8,144.16 | 4,894.16 | 7,855.64 | 10,188.98 | 4,550.00 |
| Fagan | 8,144.16 | 4,894.16 | 8,550.00 | 10,883.34 | 4,550.00 |
| Sawyer | | | 4,500.00 | 4,500.00 | 2,275.00 |
|  | 34,288.32 | 17,138.32 | 35,905.64 | 31,572.32 | 17,375.00 |

We find as a reasonable allowance for salaries the following amounts for 1917 and 1918:

|  | 1917. | 1918. | |
|---|---|---|---|
| Garvey | $6,000.00 | $6,000.00 | |
| King | 6,000.00 | 6,000.00 | |
| Considine | 6,000.00 | 3,000.00 | To July 1, 1918. |
| Keene | 7,800.00 | 7,236.68 | To Dec. 4, 1918. |
| Fagan | 7,800.00 | 7,800.00 | |
| Sawyer | | 2,275.00 | From July 1, 1918. |
|  | 33,600.00 | 32,311.68 | |

Considine resigned as vice president on July 1, 1918. Sawyer commenced his service with taxpayer on July 1, 1918; he was not with the taxpayer in 1917. Keene resigned on December 4, 1918.

The following table shows the figures used and depreciation found by the Commissioner for 1918:

| Property. | Cost Jan. 1, 1918. | Additions in 1918. | Rate. | Amount of depreciation. |
|---|---|---|---|---|
| | | | Per cent. | |
| Factory buildings | $18,485.23 | $16,470.00 | 15 | $4,008.03 |
| Office buildings | 10,332.54 | | 3 | 154.99 |
| Machinery and fixtures | 17,744.81 | 25,488.98 | 15 | 4,573.40 |
| Motors and wiring | 1,562.73 | 6,067.04 | 15 / 22½ | 919.25 |
| Automobiles | 1,600.00 | 575.80 | 25 | 459.48 |
| | | | | 10,115.15 |

The taxpayer in its return deducted a total of $14,391.04.

For 1920 the Commissioner found depreciation as shown by the following tabulation:

| Property. | Cost Jan. 1, 1920. | Additions in 1920. | Rate. | Amount of depreciation. |
|---|---|---|---|---|
| | | | Per cent. | |
| Factory buildings | $35,583.40 | $997.29 | 10 | $3,608.21 |
| Office buildings | 10,332.54 | | 3 | 309.98 |
| Machinery and fixtures | 60,888.60 | 8,434.84 | 10 | 6,510.60 |
| Motors and wiring | 9,298.10 | | 15 | 1,394.72 |
| Automobiles | 2,175.80 | 2,175.80 | 25 | 543.95 |
| | | | | 12,367.46 |

The amount deducted by the taxpayer was $22,018.51.

In arriving at the depreciation on the additions, the Commissioner took 50 per cent of the cost as representing the average for the year.

The Commissioner adopted for factory buildings a rate of 10 per cent; for machinery and fixtures 10 per cent; and for motors and wiring 15 per cent. In 1918, however, the rate for factory buildings was increased 50 per cent, because of the effect on the buildings of fumes from surrounding plants; the rates for machinery and fixtures and for the additions to motors and wiring were each increased 50 per cent, because of overtime work.

The taxpayer claims the Commissioner has failed to take into account property that became obsolete in 1918, amounting to $2,-138.42, and in 1920, to $8,391.15. It contends that the depreciation (including obsolescence) originally taken by it should be allowed, or, if the Commissioner's figures are adopted, the obsolescence should be added; or, in the alternative, that its depreciation should be revised for the years 1918, 1919, and 1920, in accordance with the following statement:

| Property. | 1918. | | 1919. | | 1920. | |
|---|---|---|---|---|---|---|
| | Per cent. | | Per cent. | | Per cent. | |
| Factory buildings | 15 | $4,156.50 | 15 | $5,315.15 | 15 | $5,437.06 |
| Office building | 5 | 258.81 | 5 | 516.63 | 5 | 516.63 |
| Machinery and fixtures | 15 | 4,956.20 | 10 | 5,428.98 | 10 | 6,242.08 |
| Motors and wiring | 20 | 906.17 | 20 | 1,692.78 | 20 | 1,859.62 |
| Automobiles | 25 | 642.79 | 25 | 695.92 | 25 | 695.92 |
| | | 10,920.47 | | 13,649.46 | | 14,751.31 |

The following is a comparison of the taxpayer's original claim, the Commissioner's allowance, and the revised depreciation contended for as an alternative:

| | Returns. | Commis-sioner. | Revised. | | |
| --- | --- | --- | --- | --- | --- |
| | | | Depreciation. | Obsolescence. | Total. |
| 1918 | $14,391.04 | $10,115.15 | $10,920.47 | $2,137.47 | $13,057.94 |
| 1919 | 9,258.97 | 10,856.57 | 13,649.46 | | 13,649.46 |
| 1920 | 22,018.51 | 12,367.46 | 14,751.31 | 7,137.59 | 21,888.90 |
| | 45,668.52 | 33,339.18 | '39,321.24 | 9,275.06 | 48,596.30 |

The property named below became obsolete and was scrapped without salvage in 1918 and 1920:

*Obsolescence, 1918.*

| Date acquired. | Factory buildings. | Cost. | Deprecia-tion to Dec. 31, 1917. | Obsoles-cence, 1918 |
| --- | --- | --- | --- | --- |
| 1916 | Part of old building | $1,077.50 | $537.50 | $540.00 |
| 1917 | Temporary shop office | 230.00 | 46.00 | 184.00 |
| 1917 | Shop foundation | 109.05 | | 109.05 |
| 1917 | Addition to shop office | 252.74 | 50.55 | 202.19 |
| | | 1,669.29 | 634.05 | 1,035.24 |
| | Machinery and fixtures. | | | |
| 1917 | Niles radial drill | 359.70 | 179.85 | 179.85 |
| 1918 | Boilers | 467.38 | | 467.38 |
| 1917 | Stiff-leg derrick | 910.00 | 500.50 | 405.00 |
| | | 1,737.08 | 634.85 | 1,052.23 |

*Obsolescence, 1920.*

| Date acquired. | Machinery and fixtures. | Cost. | Deprecia-tion to Dec. 31, 1919. | Obsoles-cence, 1920. |
| --- | --- | --- | --- | --- |
| 1916 | Bending roll | $500.00 | $150.00 | $350.00 |
| 1919 | Six chain hoists | 300.00 | 16.50 | 283.50 |
| 1920 | Bertsch punch | 630.00 | | 630.00 |
| 1917 | Westinghouse air compressor | 878.65 | 60.00 | 818.65 |
| 1920 | Chicago air compressor | 1,280.00 | | 1,280.00 |
| 1917 | Horizontal punch | 800.00 | 155.00 | 645.00 |
| 1917 | Hoisting engines | 600.00 | 110.00 | 490.00 |
| 1919 | ....do | 490.00 | 21.00 | 469.00 |
| 1917 | Electric crane | 4,200.00 | 795.00 | 3,405.00 |
| | | 9,678.65 | 1,307.50 | 8,371.15 |

The following statement shows the depreciable costs claimed by the taxpayer:

1918.

Factory buildings:

| | | |
|---|---:|---:|
| Cost to Jan. 1, 1918 | | $20, 299. 77 |
| Additions in 1918— | | |
| Oct. 31 | $7, 000. 00 | |
| Dec. 31 | 1, 500. 00 | |
| | 3, 504. 30 | |
| | 2, 400. 00 | |
| | | 14, 404. 30 |
| Sept. 30 | 351. 00 | |
| Oct. 31 | 700. 00 | |
| Nov. 30 | 300. 00 | |
| | 16. 26 | |
| | 136.00 | |
| Dec. 31 | 482. 24 | |
| | 100. 00 | |
| | | 2, 085. 50 |
| | | 36, 789. 57 |
| Office building: Erected in 1918 | | 10, 332. 54 |
| Machinery and fixtures: | | |
| Cost to Jan. 1, 1918 | | 20, 553. 67 |
| Additions in 1918 | $25, 309. 20 | |
| | 1, 336. 58 | |
| | | 26, 645. 78 |
| Motors and wiring: | | |
| Cost to Jan. 1, 1918 | | 1, 432. 00 |
| Additions in 1918 | | 6, 179. 77 |
| Automobiles: | | |
| Cost to Jan. 1, 1918 | | 2, 358. 70 |
| Additions in 1918— | | |
| Jan. 31 | | 675. 00 |
| July 31, credit, property sold | | 250. 00 |

1920.

| | | |
|---|---:|---:|
| Factory buildings: | | |
| Cost to Jan. 1, 1920 | | $37, 417. 74 |
| Additions in 1920— | | |
| Dec. 30 | $600. 00 | |
| 31 | 397. 29 | |
| | | 997. 29 |
| Office building: Cost to Jan. 1, 1920 | | 10, 332.54 |
| Machinery and fixtures: | | |
| Cost to Jan. 1, 1920 | | 65, 854. 26 |
| Additions in 1920 | | 8, 285. 96 |
| Motors and wiring: | | |
| Cost to Jan. 1, 1920 | | 9, 298. 10 |
| No additions. | | |
| Automobiles: | | |
| Cost to Jan. 1, 1920 | | 2, 784. 50 |
| No additions. | | |

We find these cost figures should be revised as indicated below, and that, as so changed, they are correct.

*Factory buildings.*—The cost to January 1, 1918, should be reduced by $1,669.29, being the cost of property which became obsolete and was charged off in 1918. There should be eliminated from the additions made during the year the expenditures made on December 31, 1918, and on December 30 and 31, 1920.

In ascertaining depreciation on the other additions, it should be computed from the dates on which the expenditures were made, respectively.

*Office building.*—There is no evidence of expenditure in 1918. The books show an entry of $9,332.54 in 1919. This amount should be used for 1920.

*Machinery and fixtures.*—The January 1, 1918, cost should be reduced by the cost of property scrapped and charged off in this year which was acquired prior thereto, amounting to $1,069.70. The January 1, 1920, cost should be reduced $7,768.65 for property scrapped in 1920. The additions in 1918 should be reduced by the amount of $467.38, and additions in 1920 by $1,910, being the cost of property acquired and scrapped in the same year.

We find that the rates of depreciation used by the Commissioner are reasonable, except that the rate of 22½ per cent for motors and wiring in 1918 should apply to the property acquired prior to January 1, as well as to that added during the year.

In addition to depreciation ascertained as above set forth, there should be allowed deductions for obsolescence as follows:

### 1918.

Factory buildings_____ $1, 035. 24
Machinery and fixtures_____ 1, 052. 23

### 1920.

Machinery and fixtures_____ $8, 371. 15

### DECISION.

The deficiency should be recomputed in accordance with the findings of fact and opinion, and settled on 10 days' notice, under Rule 50.

### OPINION.

STERNHAGEN: There are three main subjects of controversy between the parties: (1) Fraud, (2) salary deductions, and (3) depreciation deductions. The fraud penalty is based entirely upon the taxpayer's salary deduction and most of the evidence was directed to these two related issues. Throughout a prolonged hearing there was much conflicting evidence, from which it is extremely

difficult to conclude with certainty what the facts in many respects actually were. The recollections of the numerous witnesses were at variance, sometimes as to details and sometimes as to matters of primary significance. Some of the witnesses had long since quarrelled and their testimony was unmistakably affected by their personal feelings. During the early history of this business things were moving rapidly and it was apparently difficult to ascertain clearly what happened or why. But the Board is charged with the duty of making findings of fact as the basis of its decision, and therefore, out of varying and conflicting evidence, we have sought to find the preponderance and base our findings thereon.

(1) *Fraud.*—The Commissioner has asserted that there was a fraudulent return with intent to evade tax, and hence he has determined that the normal deficiency should be augmented by a penalty of $37,073.38 for 1917. This is based upon the view that the taxpayer's deduction in 1917 of $49,100 in officers' salaries was knowingly false because no such obligation existed during the taxable year and that the officers signing the return knew that there was no such liability. While there is some substantial conflict in the evidence as to whether and when this liability arose, and while the impression which we gather is not free from doubt, we can not sanction an assessment of a fraud penalty on mere suspicion or because the memories of witnesses may falter or conflict. Upon its face, the transcription of the minutes from one book to another and the disappearance of the old book and of the intervening supporting memoranda, the cutting out of pages of the journal and repasting, the pencil and pen interlineation of dates and substituted words, are unquestionably sufficient to give rise to suspicion of fraud. They justify careful investigation, but such investigation as was made in the present instance is not sufficient to transform suspicion into conviction. The cutting of the journal pages and repasting were satisfactorily explained to remove all doubt. The date of the meeting purporting to fix the salaries is still in great confusion. Circumstantially, it appears to have taken place in August, 1917, although there are witnesses who recall no such meeting whatever. Keene, the principal witness for the Government, a former officer and director, said that no such meeting took place, but we can not resist the impression that Keene's testimony was largely influenced by what he regarded as the necessity of self-protection from a personal deficiency, as we shall explain.

None of the officers included in his return more than the salary actually received, believing as they did that, upon the cash basis, this was a correct return. They were thereafter poorly advised, by both an outside accountant and a Government employee in the collector's office, that they were required, although on the cash basis,

to return and pay tax upon the full amount credited to them on the books of the corporation and deducted by the corporation upon its return on the accrual basis. Several of the officers acted upon this advice, filed amended returns, and paid additional tax. The Government then officially called upon Keene to do likewise. Keene refused to make an additional payment and stated that the alleged salary credited on the books and deducted by the corporation was unauthorized and did not represent a liability. Thus the Government's suspicions were aroused, which resulted in the penalty.

It is, however, not without significance that an internal revenue agent twice investigated the affairs of the corporation, once before Keene's alleged disclosure and again thereafter, and in neither of his reports did he suggest fraud or recommend a penalty as he regarded it his duty to do had he believed that fraud existed. It may be, of course, that this revenue agent was fooled, but he adhered to his position up to the time he left the witness stand at the hearing before the Board.

Four members of the Board heard all the persons who were familiar with the facts and observed them on the witness stand testifying either for the taxpayer or the Government, and after considering all the evidence we can not conclude that there was fraud. The penalty therefore is disallowed.

(2) *Salaries.*—The returns of the taxpayer were made upon the accrual basis, and for 1917 it included in its deductions for expenses the amount of $49,100, which was entered in the journal for 1917 as a closing entry. This amount was arrived at by applying the salaries set forth in the resolution of August 5 to the period back to January 1, 1916. We must examine this deduction and determine from the evidence whether it represents an accrued ordinary and necessary expense consisting of a reasonable allowance for salaries. In this connection much has been said as to whether the meeting took place August 5, 1916, or August 5, 1917—assuming that it took place at all. This latter assumption we think is warranted. We are inclined to give credence to the several witnesses who testified that the meeting took place and that this was a correct record of the proceedings. It seems to us, however, from the circumstances, that the meeting probably occurred in 1917. Affairs in 1916 were too uncertain to make it probable that salaries at that time were fixed so greatly in excess of the amounts actually paid. The omission of salary to McGaffic is also some indication that the resolution was not made in 1916; for McGraffic was with the company in August, 1916, and quit in December. Furthermore, the resolution fixes salary for Considine as vice president, although there is no record of his election to this office until February 10, 1917. In an audit of April, 1917, by outside accountants, no mention is made of ac-

crued salaries or of any obligation then outstanding or possible claims. And, moreover, the other minutes of 1917 lead one quite naturally to place this meeting in August, 1917. It was not until May, 1917, that the partnership property was transferred to the corporation, and it is not likely that this would be neglected by officers who were foresighted enough to determine a schedule of salaries for the distant future. We are therefore of the opinion that the meeting took place on August 5, 1917, when for the first time the obligation for salaries arose.

Thus we have the recognition in August, 1917, of the monthly value of the services and an entry at the close of that year applying this rate. But this entry included not only the application of the rate to 1917 but also to 1916, and it is contended by the taxpayer that this was an accrued obligation of 1917 and therefore properly deductible from gross income in that year. We are of opinion, however, that the argument goes too far. The statute permits the deduction of ordinary and necessary expenses, including a reasonable allowance for salaries, and, to the extent that an accrued expenditure goes beyond these statutory qualifications, it may not be deducted. By the resolution the parties have agreed upon the compensation for services rendered, and thus they have fixed what we may properly regard as the ordinary and necessary expense and the reasonable allowance for salaries. While it may be proper, and in this proceeding can not be questioned, that the corporation should recognize past services by making the new salaries retroactive and thus incurring a fixed obligation therefor, this is not conclusive that such an obligation represents a reasonable allowance for salaries for the taxable year or in other respects an ordinary and necessary expense for the taxable year. In view of the necessity of reaching a fair and practical disposition of these issues from a confused record, we are of opinion that the salary deduction for the years 1917 and 1918 should not exceed the amounts, heretofore set forth, aggregating $33,600 for 1917 and $32,311.68 for 1918.

(3) *Depreciation.*—The issue with respect to the deduction of a reasonable allowance for the exhaustion, wear and tear and obsolescence of the taxpayer's property during the taxable years 1918 and 1920 is so much a question of detailed fact that discussion of our findings would serve no useful purpose. We have considered all of the evidence, including the exhibits. The taxpayer's deductions have not been uniform, because the circumstances during the years in question were not uniform, and we can not therefore approve entirely the Commissioner's computations. Nor, on the other hand, would we be justified in approving the deductions taken by the taxpayer; for in some instances they seem to involve duplications—depreciation being deducted upon property abandoned as

obsolete during the year. We have therefore reached our independent conclusions, all of which are set forth in our findings of fact.